```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
BRENNAN EVANS,                           :
                                         :
                Plaintiff,               :   CASE NO.: _____
                                         :
       -against-                         :
                                         :
NIGHTSTAR THERAPEUTICS PLC, CHRIS        :
HOLLOWOOD, DAVID FELLOWS, PAULA          :
COBB, DAVID LUBNER, JAMES                :
MCARTHUR, DAVID MOTT, and SCOTT          :
WHITCUP,                                 :
                                         :
                Defendants.              :
---------------------------------------- X
```

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Brennan Evans ("Plaintiff"), on behalf of himself, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Nightstar Therapeutics plc ("Nightstar" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Nightstar, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Nightstar by Biogen Inc. through Tungsten Bidco Limited ("Bidco"), a newly-incorporated company and wholly-owned subsidiary of Biogen Switzerland Holdings GmhH ("Bidder").

1

2. On March 4, 2019, Bidder, Bidco and Nightstar entered into the Implementation Agreement (the "Merger Agreement"), pursuant to which Nightstar will be acquired by Bidder through Bidco, whereby Bidco will acquire all of the issued and to be issued share capital of Nightstar (the "Proposed Transaction").

3. Under the terms of the Merger Agreement, each outstanding share of Nightstar common stock will be converted into the right to receive $25.50 (USD) in cash (the "Merger Consideration").

4. On April 9, 2019, in order to convince Nightstar's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Nightstar; and (ii) the valuation analyses performed by the Nightstar's financial advisor, Centerview Partners LLC ("Centerview").

6. The special meeting of the Company's shareholders to vote on the Proposed Transaction is currently scheduled for May 8, 2019 (the "Shareholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can properly exercise his corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Plaintiff and Nightstar's public common shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the

Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Nightstar's common stock is listed and traded on the Nasdaq, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of Nightstar common stock.

12. Defendant Nightstar is a public limited company incorporated in England and

Wales with its registered office at 10 Midford Place, London, W1T 5BJ. Nightstar's common shares are traded on the Nasdaq under the ticker symbol "NITE."

13. Defendant Chris Hollowood is, and has been at all relevant times, a director of the Company, and currently serves as Chairman of the Board.

14. Defendant David Fellows is, and has been at all relevant times, a director of the Company, and currently serves as Nightstar's Chief Executive Officer.

15. Defendant Paula Cobb is, and has been at all relevant times, a director of the Company.

16. Defendant David Lubner is, and has been at all relevant times, a director of the Company.

17. Defendant James McArthur is, and has been at all relevant times, a director of the Company.

18. Defendant David Mott is, and has been at all relevant times, a director of the Company.

19. Defendant Scott Whitcup is, and has been at all relevant times, a director of the Company.

20. The defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Nightstar, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21. Nightstar is a leading clinical-stage gene therapy company focused on developing and commercializing novel one-time treatments for patients suffering from rare inherited retinal diseases that would otherwise progress to blindness.

22. Biogen, the ultimate parent company of Bidder, is a global biopharmaceutical company focused on discovering, developing and delivering worldwide innovative therapies for people living with serious neurological and neurodegenerative diseases, including in its core growth areas of multiple sclerosis and neuroimmunology, Alzheimer's disease and dementia, movement disorders, including Parkinson's disease, and neuromuscular disorders, including spinal muscular atrophy and amyotrophic lateral sclerosis.

23. On March 4, 2019, the Board caused the Company to enter into the Merger Agreement.

24. Pursuant to the terms of the Merger Agreement, each outstanding share of Nightstar common stock will be converted into the right to receive $25.50 (USD) in cash.

25. On March 4, 2019, Nightstar issued a press release announcing the Proposed Transaction, which stated in relevant part:

**Nightstar Therapeutics plc reaches agreement to be acquired by Biogen**

- Biogen to acquire Nightstar for US$ 25.50 per share in cash

- Transaction expected to be completed by mid-year 2019

WALTHAM, Mass. and LONDON, March 04, 2019 (GLOBE NEWSWIRE) -- Nightstar Therapeutics plc ("**Nightstar**") (NASDAQ: NITE), a clinical-stage gene therapy company developing treatments for rare inherited retinal diseases and Biogen Inc. ("**Biogen**") are pleased to announce that they have reached agreement on the terms of a recommended acquisition whereby the entire issued and to be issued share capital of Nightstar will be acquired by Tungsten Bidco Limited (a newly-incorporated company and wholly-owned subsidiary of Biogen Switzerland Holdings GmbH ("**Bidder**")). It is intended that the Acquisition will be implemented by means of a U.K. Court-sanctioned scheme of arrangement under Part 26 of the U.K. Companies Act 2006.

Under the terms of the Acquisition, Nightstar Shareholders will be entitled to receive USD 25.50 in cash for each Nightstar Share. The terms of the Acquisition values Nightstar's entire issued and to be issued share capital at approximately USD 877 million and the terms

of the Acquisition represent a premium of approximately 70 per cent. to the 30 trading day volume-weighted average price per Nightstar ADR of USD 15.02 for the period from 17 January 2019 to 1 March 2019 (being the last practicable date prior to the date of this Announcement).

Commenting on the Acquisition, David Fellows, Chief Executive Officer of Nightstar, said:

*"Our agreement with Biogen will give us the platform and resources to expand our mission to maintain and restore sight in patients with inherited retinal diseases. This transaction accelerates treatment to patients through Nightstar's key retinal gene therapy programs that modify or halt progression of blindness. Together, with Biogen's expertise in rare diseases, worldwide reach and extensive resources, we will dramatically improve the lives of patients around the world who currently have no treatment options. We are proud of what Nightstar has accomplished, and we thank our team for their tireless work to improve the lives of our patients and their families."*

Commenting on the Acquisition, Chris Hollowood, Chairman of Nightstar, said:

*"Over the last six years since foundation in 2013, Nightstar has established itself as one of the global leaders in retinal gene therapies. I am proud of Nightstar's achievements, delivering two proof-of-concept programs and building a world class organisation. We look forward to seeing the next chapter of Nightstar's journey under Biogen's ownership, as it works to achieve its ultimate ambition of delivering transformational treatments to patients."*

**Acquisition details**

It is intended that the Acquisition will be implemented by means of a U.K. Court-sanctioned scheme of arrangement under Part 26 of the Companies Act (or, if Biogen elects, subject to the consent of Nightstar and subject to the terms of the Implementation Agreement, an Offer). The Acquisition is conditional on, among other things: (i) the approval of Nightstar Shareholders at the Court Meeting and the passing of the resolutions by Nightstar Shareholders at the General Meeting; and (ii) the sanction of the Scheme by the U.K. Court; and (iii) approval from competition authorities in the U.S and Germany. The Acquisition does not require the approval of Biogen Shareholders.

The Acquisition is expected to become Effective by mid-year 2019, subject to the satisfaction (or, where applicable, waiver) of the Conditions set out in Appendix I to this Announcement.

> Further details of the Acquisition will be contained in the Scheme Document which is intended to be posted to Nightstar Shareholders along with notices of the Court Meeting and General Meeting and the Forms of Proxy within 15 Business Days following the date Nightstar has cleared comments received from the U.S. Securities and Exchange Committee ("**SEC**"), if any, on such document, unless Nightstar and Bidder otherwise agree to a later date.
>
> Centerview Partners is acting as lead financial advisor to Nightstar. Jefferies LLC is also acting as financial advisor to Nightstar. Skadden, Arps, Slate, Meagher & Flom LLP is acting as legal counsel to Nightstar.

**The Proxy Omits Material Information**

26. On April 9, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

27. First, the Proxy fails to provide sufficient information regarding the financial projections for Nightstar.

28. Specifically, the *Certain Forecasts* section of the Proxy discloses 3 sets of financial projections for Nightstar: the Case A Forecasts, the Case B Forecasts, and Case C Forecasts. *See* Proxy at 30-32.

29. The Proxy further discloses that "Nightstar's management considered it appropriate to prepare forecasts presenting three scenarios to reflect varying commercial assumptions and probability of success with respect to Nightstar's lead clinical product candidates." *Id.* at 30.

30. However, the Proxy omits material information concerning: (1) which case reflects the best currently available estimates and good faith judgments of the management of Nightstar as

7

to the future financial performance of Nightstar; and (2) the specific adjustments, assumptions, and probabilities of success underlying each of the different cases.

31.     Numerous courts have championed the importance of management based financial projections because a company's management has unique insight into their firm's future and the value of the company that the market does not.  Shareholders cannot hope to replicate management's inside view of the Company's prospects.  The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making.

32.     Such information is particularly material in light of the fact that Nightstar shareholders are being asked whether to accept a one-time payment of cash and forsake any future interest in the company.

33.     Indeed, Centerview's *Discounted Cash Flow Analysis* was prepared with all three sets of the Nightstar projections, which returned *drastically* different results:

| Case | Implied Per Nightstar Share Equity Value Range |
|---|---|
| Case A Forecasts | $ 34.19 – $38.89 |
| Case B Forecasts | $ 19.72 – $22.19 |
| Case C Forecasts | $ 11.98 – $13.31 |

34.     Accordingly, if the Case A Forecasts depict Company management's best currently available estimates and good faith judgments as to the future financial performance of Nightstar, *every* analysis prepared by Centerview demonstrates that the Merger Consideration fails to adequately compensate shareholders, as the Merger Consideration falls *either* on the lower end of the implied per share equity value range *or, more concerningly,* **entirely outside the range of reasonableness**, as illustrated by Centerview's *Discounted Cash Flow Analysis*.

35.     With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths**.  By disclosing the Nightstar projections, Defendants had an

8

obligation to provide materially complete and accurate disclosures concerning the management projections.

36. Indeed, management's best estimate of the cash flow a corporation that is proposed to be sold in a cash merger is clearly information. The question that Nightstar shareholder must ask themselves when determining whether to vote for the Proposed Transaction is clear: is the $25.50 being offered now fair compensation for the benefits I would receive as a shareholder from the future expected cash flows of Nightstar if the Company remained a going concern. Absent disclosing which specific iteration (*i.e.,* Case A Forecasts, the Case B Forecasts, and Case C Forecasts) depicts Company management's best currently available estimates and good faith judgments as to the future financial performance of Nightstar, Company shareholders will be unable to make such a decision, in violation of the Exchange Act.

37. Second, the Proxy describes Centerview's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Centerview's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Nightstar's shareholders will be unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Centerview's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Nightstar's common shareholders.

38. With respect to Centerview's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rates ranging from 12.5% to 15.0%; and (ii) Nightstar's projected net operating losses and future losses. *See* Proxy at 28.

39. These key inputs are material to Nightstar's shareholders, and their omission

renders the summary of Centerview's *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a DCF analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Davidoff, *Fairness Opinions* at 1576. Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars… This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Nightstar shareholders cannot evaluate for themselves the reliability of Centerview's DCF analysis, make a meaningful determination of whether the implied per share equity value ranges reflect the true value of the Company or was the result of Centerview's unreasonable judgment, and make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction.

40. Furthermore, the Proxy discloses that Centerview conducted a *Precedent Premiums Paid Analysis*. However, the supposed "summary" of the analysis simply discloses that Centerview considered an *unknown number* of *unknown transactions* and calculated *unknown premiums* associated with each *unknown* transaction's (i) one-day prior to the first public

10

knowledge of the possibility of the transaction, and (ii) volume weighted average market price per share, which is referred to as the "VWAP," over the 30 trading days prior to the first public knowledge of the possibility of the transaction. After analyzing the above-referenced unknown information, Centerview concluded its analysis by disclosing the illustrative range of premiums and the corresponding implied per share equity value reference ranges.

41. The failure to disclose the specific number of transactions considered, the specific identities of each transaction, and their individual one-day prior and 30 VWAP premiums renders the *Precedent Premiums Paid Analysis* materially incomplete and misleading, as Nightstar shareholders are unable to evaluate an entire analysis that the Board considered when deciding to enter into the Merger Agreement and unanimously recommend the Company's shareholders vote their shares in favor of the Proposed Transaction. Consequently, without the additional information, Nightstar shareholders are unable to make a meaningful determination of whether the implied equity value per share ranges reflect the true value of the Company or was the result of Centerview's unreasonable judgment, and make an informed decision regarding whether to vote their share sin favor of the Proposed Transaction.

42. Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

43. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's shareholders, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

46. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

47. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

48. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Nightstar; and (ii) the valuation analyses performed by Centerview.

49. In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's common shareholders although they could have done so without extraordinary effort.

50.  The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Board, Nightstar management, Nightstar's outside legal counsel, and Centerview all reviewed and assessed financial projections for Nightstar, and further states that the Board considered the fairness opinion provided by Centerview and the assumptions made and matters considered in connection therewith, which included financial projections for Nightstar. Further, the Individual Defendants were privy to and had knowledge of the projections for Nightstar and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

51.  The Individual Defendants were, at the very least, negligent in preparing and

reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

52. Nightstar is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

53. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the special meeting of the Company's shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

54. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55. The Individual Defendants acted as controlling persons of Nightstar within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Nightstar, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

14

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

58. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

59. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

61. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and/or permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

//

//

//

//

//

Dated: April 26, 2019                                    **MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building 350 Fifth
Avenue, Suite 4405 New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*